**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| ———————————————— X | |
| LEE MULLER, | |
| Plaintiff, | Civil Action No. 1:23-cv-00880 |
| -against- | JURY TRIAL DEMANDED |
| VENTURE GLOBAL LNG, INC., | |
| Defendant. | |
| ———————————————— X | |

## COMPLAINT

Plaintiff Lee Muller ("Muller" or "Plaintiff"), as and for his Complaint herein against defendant Venture Global LNG, Inc., formerly known as Venture Global LNG, LLC ("Venture Global", the "Company" or "Defendant"), alleges as follows:

### Nature Of The Action

1.    This is an action for breach of a stock option grant agreement.  In sum, the Company, a supplier of liquified natural gas ("LNG"), has sought to deprive Muller, one of the first advisors of the Company when it was a mere start-up, of his right to exercise his stock options and obtain the corresponding shares in the Company, which are now worth approximately $8 million.

2.    As with most individuals who participate in a start-up, Muller agreed to be an advisor for the Company in return for the stock options and the prospects for growth at the Company.  Muller received no other salary or compensation, solely the options.

3.    Muller was invited to join the Advisory Board of the Company in 2014, at which time the Company granted him 10-year options on shares equal to 0.125% of the Company's equity

value based on a $1 million valuation, vesting over three years on a quarterly basis.  The grant was equal to options on 500 shares and was based on the Class A share count of 400,000, with a corresponding strike price of $2.50 per share.

4.      The Company capitalized on Muller's name, reputation, and professional credibility in the energy and project finance industry in the Company's early years to build the business, particularly with respect to its first successful capital raise.

5.      The Company disbanded the Advisory Board after two years, at which point Muller's options ceased vesting.  Muller currently holds options for 333.33 shares in the Company.

6.      The Company has  enjoyed exponential success due to a combination of successful project development,  financing and commercialization, as well as an upsurge in need for a steady supply of LNG due to global uncertainties and supply shortages.  Upon information and belief, the Company now has an equity valuation exceeding $15 billion.

7.      Nevertheless, and as more fully set forth below, the Company has inexplicably refused to allow Muller to exercise his options in violation of Muller's contractual rights to do so and through acts of bad faith.

8.      The Company's co-founders and majority stockholders, Robert Pender ("Pender") and Michael Sabel ("Sabel"), who have controlled and continue to control the Company at all relevant times, seem intent to cause the options to expire in March 2024 in order to enrich themselves and to cause Muller to lose the complete benefit of his options.    However, the Company has no legal right to do so and is acting in bad faith, and is therefore in breach of its contractual obligations.

9.      In particular, and as more fully set forth below, the Company is claiming that Muller may only exercise his options with the Company's consent, apparently in reliance upon a

2

subsequent stock option agreement from 2017. However, that 2017 agreement is entirely unsupported by consideration, and is therefore unenforceable under governing Delaware law. Further, even if Company consent was required – and it is not – any consideration of whether to grant consent must be conducted in accordance with the implied covenant of good faith inherent in every contract, but here, the Company has acted in bad faith.

10. Accordingly, Muller has been illegally and improperly deprived of the value of his options and corresponding shares, and is due in excess of $8 million in damages from the Company.

**The Parties, Jurisdiction and Venue**

11. Muller is a United States citizen currently residing in London, UK. Muller is not a citizen of the State of Delaware or the Commonwealth of Virginia.

12. Upon information and belief, the Company is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1001 19th Street, North Suite 1500, Arlington, Virginia 22209. Upon information and belief, the Company is a producer of North American LNG. According to the Company's website, the Company's export facilities, Calcasieu Pass, Plaquemines, LNG, CP2 LNG and Delta LNG will supply the world's growing demand for North American energy.

13. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

15. This Court has personal jurisdiction over the Company because it is a citizen of the Commonwealth of Virginia. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Company resides in this District and a substantial part of the events and omissions giving rise

to the claims herein occurred in this District.

## Facts Common To All Claims

A.    **Muller Joins The Company's Advisory Board And Is Granted Stock Options**.

16.    By letter dated March 20, 2014 (the "2014 Option Agreement"; Exhibit A hereto), the Company offered Muller a position on the Company's Advisory Board.  As incentive for joining the Advisory Board, the Company offered Muller options as follows:  "[T]en-year options equal to 0.[]125[1] of the Company's common equity or equivalent (the 'Option' [referenced herein as the "Options"]) vesting over a three-year period on a quarterly basis.  The strike price of the Option[s] will be based upon a company valuation of $1 million.  As we are currently structured as a Delaware LLC, the options will be structured as participation in our Membership Interest or converted to equity options if Venture Global is converted to a corporations."  (Exhibit A hereto at p. 1).

17.    The 2014 Option Agreement further provided that the "Option[s] will commence vesting at acceptance by you of the terms described in this letter.  Vested options will be available for exercise after completion of the next capital raising.  Other than as described herein, the Option[s] will be subject to the terms of the VG LNG company stock option plan that will be established at or prior to Financial Close, as defined below" (Exhibit A hereto at p. 1).

18.    Muller accepted the offer shortly thereafter, became an Advisor to the Company, and was awarded the Options covering 500 shares (400,000 outstanding shares x .125% or .00125 = 500 shares) at a strike price of $2.50 ($1 million valuation/400,000 shares = $2.50 value per share).

---

[1] Although the 2014 Option Agreement contained a typo in the form of a "0" before the .125% figure (.0125%), each party has acknowledged the typo, and there is no dispute that the Options award was equal to .125% of the Company's equity, or for Options covering 500 shares as further set forth herein.

19.     The Company listed Muller as an Advisor on numerous documentation, including investment and marketing materials, trading off his name, reputation, and professional credibility to attract employees, investors and business.  The Company completed its "next capital raising" and the Options became available for exercise.

20.     Muller's Options vested over eight quarters.  Muller therefore vested in options to purchase 333.33 shares of common stock.

21.     By email dated June 15, 2016, just a few days before the next quarterly vesting, the Company advised Muller that the Company was eliminating the Advisory Board (and thus his membership) effective June 17, 2016.

22.     By that time, the Company had acknowledged that the Option grant to Muller, after the eight vesting periods, equated to Options covering 333.33 shares of the Company's Series A Common Stock at an exercise price of $2.50.  The Company subsequently acknowledged the same in a Memo to Muller dated June 26, 2017 (the "June 2017 Memo"; Exhibit B hereto).

23.     Pursuant to the 2014 Option Agreement, and notwithstanding the Company's termination of the Advisory Board, Muller had the remainder of the ten-year term, or until about March 20, 2024, to exercise the Options.  The Company has never contested this time frame.

24.     As referenced above, the Company has experienced great success and, upon information and belief, the Company common shares are now worth not less than $25,000 per share (see screen shot showing a valuation by PIMCO, one of the Company's largest shareholders, listing the shares as being valued on its books at approximately $25,000 per share, at Exhibit C hereto).

25.     Hence, the shares covered by Muller's Options are worth not less $8,332,416.67 ($8,333,250 (333.33 shares x $25,000) less the exercise price of  $833.33 (333.33 shares x $2.50

5

= \$833.33) = \$8,332,416.67).

B.    **The Company Wrongfully Prevents Muller From Exercising The Options And/Or Obtaining the Shares.**

26.    By letter dated February 16, 2023, Muller (along with other option holders) reached out to the Company to notify the Company of Muller's intention to exercise the Options before they expire in March 2024, and to coordinate with the Company on the process and paperwork for doing so (the "February 16 Letter"; Exhibit D hereto).

27.    By letter dated March 1, 2023, the Company responded to Muller and advised him that it would not permit Muller to exercise his Options.  In particular, the Company wrote that "the consent of the Compensation Committee [of the Company] is required for any exercise", and "[u]pon consideration of your request, the Compensation Committee did not consent", with no explanation whatsoever (see the "March 1 Letter"; Exhibit E hereto).

28.    By letter dated March 8, 2023, Muller (and other option holders) responded to the Company (the "March 8 Letter"; Exhibit F hereto).  Muller requested certain additional information, including the grounds upon which the so-called "Compensation Committee" was refusing to allow Muller to exercise his Options.  This constituted yet another reasonable request for disclosure, information, and cooperation.

29.    The Company responded by letter dated March 10, 2023 (the "March 10 Letter"; Exhibit G hereto).  The Company again claimed that the "Compensation Committee" would not provide consent to the exercise, and refused to provide any information or rationale.

C.    **No Company Consent Is Required For Muller to Exercise The Options.**

30.    No consent is required for Muller's exercise of the Options, and the Company's insistence that consent is required constitutes a breach of the 2014 Option Agreement.

31.    In particular, as set forth above, the 2014 Option Agreement contained no such

6

consent requirement.

32.    In contending that consent is required, the Company is not relying upon the 2014 Option Agreement.   Rather, the Company is apparently relying upon a subsequent Option Agreement Amended and Restated June 13, 2017 (the "2017 Option Agreement"; Exhibit H hereto) that was executed by the Company and Muller on or about that date.   While the 2017 Option Agreement does contain a consent requirement, that 2017 Option Agreement, which is governed by Delaware law, is unenforceable because it lacks consideration.

33.    In particular, as set forth above, the 2014 Option Agreement is an enforceable agreement.  It entitled Muller to the Options covering 500 shares at a strike price of $2.50 for a ten-year period vesting quarterly, and the Company previously had acknowledged that Options covering 333.33 shares had previously vested.  The Company further acknowledges this in the June 2017 Memo referenced above (*see* Ex. B).

34.    However, once the Options began to be "in the money", the Company, through its co-founders Pender and Sabel, endeavored to place new restrictions upon Muller in an attempt to prevent Muller from ever exercising his Options, in order to enrich themselves and consolidate ownership of the company without providing any consideration for the restrictions.

35.    In particular, in the June 2017 Memo, Pender and Sabel represented to Muller, who is not a lawyer, that it was and is somehow necessary for Muller to execute the 2017 Option Agreement in order to hold his Options.  Indeed, they wrote "[a]s you know, it was always the Company's intention to fully document the option grants at a time after the original grants".  They attached the draft 2017 Option Agreement and wrote that it "recognizes your right to an option covering 333.33 shares of the Company's Series A Common Stock at an exercise price per share of Two Dollars and Fifty Cents ($2.50).  In addition, the [] Agreement provides that you will have

7

the entire remaining ten (10) year term to exercise your vested options". (Ex. B at p. 1).

36. The 2017 Option Agreement contained a clause essentially nullifying the whole point of Muller having an "option" in the first place – a requirement that, pre-IPO, any "exercise may only be effected with the consent of the [Compensation] Committee" (Ex. H at p. 3).

37. While Muller signed the 2017 Option Agreement, it is unenforceable due to a lack of consideration. Muller was no longer an advisor of the Company at that time, and received no new consideration or benefit to which he was not already entitled in return for that newly imposed consent requirement (among other new requirements) in the 2017 Option Agreement.

38. In particular, and as set forth above, prior to signing the March 2017 Option Agreement, Muller was *already* entitled to, and owned, the Options covering 333.33 shares of the Company's Series A Common Stock at an exercise price of $2.50 and *already* had the entire remaining 10-year term to exercise the vested options.

39. Hence, there is nothing in the 2017 Option Agreement that provides Muller with anything he was not already entitled to, and it therefore fails for a lack of consideration and is unenforceable as a matter of Delaware law. Sabatoro Construction Co., Inc. v. Formosa Plastics Corporation USA, 1996 WL 453460, *3 (Del. Super. June 10, 1996) (a party to a new contract "must receive something of value to which it is otherwise not previously entitled"); Seiden v. Kaneko, 2015 WL 7289338, *6 (Del. Ch. June 10, 2015) (when a party to a contract does not receive anything to which it is not already entitled, the new or amended agreement is unenforceable); Cigna Health and Life Insurance Company v. Audax Health Solutions, Inc., 107 A.3d 1082, 1088 (Del. Ch. Ct. 2014) ("[b]ecause the Release Obligation is a new obligation Defendants seek to impose on Cigna post-closing, and because nothing new is being provided to Cigna beyond the merger consideration to which it became entitled when the Merger was

consummated and its shares were canceled, I find that there is no consideration for the Release Obligation").

40. Indeed, upon information and belief, the Company is well aware that the 2017 Option Agreement requires consideration to be enforceable which is why the Company induced others at the Company to sign other forms of the 2017 Option Agreement by providing them with additional options in return for signing forms of the 2017 Option Agreement. However, the Company failed to provide Muller with anything whatsoever. This highlights the lack of consideration for the 2017 Option Agreement.

41. As a result, the Company has no basis for relying on the 2017 Option Agreement to prevent Muller from exercising his Options under the 2014 Option Agreement and obtaining shares, because the 2017 Option Agreement is unenforceable for a lack of consideration.

## FIRST CAUSE OF ACTION

### (Breach of the 2014 Option Agreement)

42. Muller repeats and realleges each and every allegation set forth above as if fully set forth herein.

43. As set forth above, the 2014 Option Agreement is an enforceable agreement between the parties.

44. Under the 2014 Option Agreement, Muller is entitled to, and owns, Options covering 333.33 common shares at an exercise price of $2.50, which, pursuant to the terms of the 2014 Option Agreement, he is free to exercise at any time during the remaining 10 year-term.

45. There is no requirement in the 2014 Option Agreement that Muller obtain the Company's consent to exercise.

46. Nevertheless, the Company has breached and/or repudiated its obligations under

the 2014 Option Agreement by refusing to allow Muller to exercise the Options and/or obtain 333.33 shares in the Company.

47. To the extent the Company is relying upon the 2017 Option Agreement in insisting on a consent requirement, that reliance fails because, as set forth above, the 2017 Option Agreement is unenforceable for a lack of consideration. Muller received absolutely nothing to which he was not already entitled to in signing the 2017 Option Agreement; therefore, it is unenforceable as a matter of law.

48. Muller has fully performed his obligations under the 2014 Option Agreement.

49. By letter dated March 28, 2023, Muller, by his counsel, demanded the relief set forth herein. However, by letters dated May 1 and May 11, 2023, the Company , through counsel, refused to provide Muller with what is contractually due to him, without providing any legal or factual basis or showing of any consideration whatsoever underlying the 2017 Option Agreement.

50. The Company's breach and/or repudiation of its obligations under the 2014 Option Agreement have caused Muller damages in an amount to be determined at trial, but believed to be not less than $8,332,416.67.

## SECOND CAUSE OF ACTION

### (Breach of 2017 Option Agreement and Implied Covenant of Good Faith, In the Alternative)

51. Muller repeats and realleges each and every allegation set forth above as if fully set forth herein.

52. In the alternative, if this Court finds that the 2017 Option Agreement is supported by consideration and enforceable, though it is respectfully submitted the Court should not do so, the Company has breached the 2017 Option Agreement and/or the implied covenant of good faith thereunder by refusing, through the purported "Compensation Committee", to grant consent for

10

Muller's exercise of the Option.

53.     "In Delaware, the implied covenant of good faith and fair dealing inheres in every contract, including those governing employment.  The covenant requires parties to a contract to refrain from arbitrary or unreasonable conduct which deprives a party from receiving the fruits of the bargain." Markow v. Synageva Biopharma Corp., 2016 WL 1613419, *7 (Sup. Ct. Del. March 3, 2016) (internal quotation marks omitted).  "The covenant of good faith and fair dealing embodies the law's expectation that each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.  The covenant protects an agreement's spirit against underhanded tactics that deny a party the fruits of the bargain."   Sheehan v. AssuredPartners, Inc., 2020 WL 2838575, *11 (Ch. Ct. May 29, 2020) (internal quotation marks omitted).

54.     Further, "a stock option, in and of itself, [] engenders a duty of the employer to deal in good faith, i.e., [to] refrain from directly frustrating the exercise of the option." Haney v. Laub, 312 A.2d 330, 334 (Sup. Ct. 1973).  The company may not act to "otherwise frustrate the exercise of the options for that purpose or reason". Haney, 312 A.2d at 333.

55.     "The implied covenant is particularly important in contracts that endow one party with discretion in performance, i.e., in contracts that defer a decision at the time of contracting and empower one party to make that decision later.  Simply put, the implied covenant requires that the 'discretion-exercising party' make that decision in good faith." Amirsaleh v. Board of Trade of the City of New York, 2008 WL 4182998, *8 (Ch. Ct. September 11, 2008); Charlotte Broadcasting, LLC v. Davis Broadcasting of Atlanta, LLC, 2015 WL 3863245, *7 (Sup. Ct. June 10, 2015) ("the implied covenant of good faith particularly applies where the contract permits a party to exercise sole discretion.  Delaware case law requires a party to exercise such discretion

11

reasonably and in good faith). "[P]arties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms." Amirsaleh, 2008 WL 4182998 at *8-9.

56.     "More recent case law reflects a willingness to allow implied covenant claims to survive, despite the presence of relevant contract language, where a defendant failed to uphold the plaintiff's reasonable expectations under that provision or failed to exercise discretion under the contract reasonably." Markow v. Synageva Biopharma Corp., 2016 WL 1613419, *7-8 (Sup. Ct. Del. March 3, 2016) (internal quotation marks omitted, emphasis in original).

57.     Further, a duty to disclose reasonable information goes hand-in-hand with the duty to act in good faith. As set forth above, the Company has a duty to refrain from directly frustrating the exercise of the option, which may include refusing to provide information reasonable and necessary to the decision to exercise and/or the process of exercising the options. See, e.g., Powe v. Cambium Learning Company, 2009 WL 2001440, *4-6 (S.D.N.Y. July 9, 2009) (a failure to provide requested information that thereby prevents option holder from exercising option(s) constitutes a breach of the company's obligations because allowing exercise of the options was contemplated under the agreement); Lentz v. Mathias, 2022 WL 2719504, *17-18 (Ch. Ct. July 13, 2022) (company has general duty of disclosure to those associated with the company making an investment decision); SEC Rule 701(e), 17 CFR § 230.701 (option holders entitled to financial information from a private company).

58.     Here, co-founders and majority shareholders Sabel and Pender who, upon information and belief, comprise any so-called "Compensation Committee" to the extent it even existed, acted in bad faith in attempting to prevent the exercise of the Options and frustrate Muller's (and others') right to obtain shares in the Company, in order to enrich themselves,

12

consolidate their ownership of the Company, avoid dilution of their shares at zero cost, and/or simply to be malicious.

59.    The Company is the discretion-exercising party and is required to exercise that discretion reasonably and in good faith, yet has clearly failed to do so.

60.    Indeed, the Company, Pender, Sabel and/or the alleged Compensation Committee are required to act reasonably and in good faith in considering a grant of consent, and to not act for an improper purpose, such as preventing the exercise of the Options for the mere sake of doing so.  They have failed to act reasonably or in good faith and have acted for improper purposes, as evidenced by, among other things, the following, upon information and belief:

- The Company either failed to set up a Compensation Committee or failed to set up one that is independent and objective, which one would reasonably expect the Company to have established under the circumstances;

- To the extent a Compensation Committee was actually established, there were no true contemporaneous deliberations of the Compensation Committee, and certainly not by any independent members thereof;

- To the contrary, the decision to withhold consent was made solely by Sabel and Pender for the sole purpose of benefitting themselves or to act maliciously to deprive Muller of his Options (see, e.g., Markow, 2016 WL 1613419 at *7-8 (Board acted unreasonably and in bad faith in purposefully waiting to price options in order to secure a financial windfall for themselves, as such conduct "frustrated [plaintiffs'] reasonable expectation of receiving the fair market value of their options, as bargained for under their employment agreements"); Sheehan, 2020 WL 2838575 at *11) (allegations that company terminated employees "in order to steal [their] Class B Profits Interest for zero consideration to pay nothing more than the cost for the [employees'] Class A-2 Interests adequately pleads that the defendant's conduct [was] driven by an improper purpose"; breach of implied covenant claim sustained));

- In the alternative, the decision to withhold consent was made for the additional purpose of improperly favoring others more connected to the Company, including Sabel and Pender (see, e.g., Amirsaleh v. Board of Trade of City on New York, Inc., 2009 WL 3756700 at *4 (Ch. Ct. Nov. 9, 2009) (giving "connected" members more time to elect merger consideration to be received "would plainly amount to bad faith"); and/or

- To the extent there was an independent Compensation Committee that made any decision at all, Sabel and Pender, upon information and belief, wrongfully interfered with that decision to cause the Compensation Committee to withhold consent to further

13

their own self-interests as set forth above (see, e.g., Semple v. Eyeblaster, Inc., 2009 WL 2709281, *5 (S.D.N.Y. Aug. 27, 2009) (interference with the granting of consent for employees to exercise options constitutes a breach of the implied covenant of good faith)).

61.     The Company's wrongdoing is further evidenced by its refusal to disclose to Muller the *reasons* for the purported decision to withhold consent, despite its duty to disclose.  This is quite telling and demonstrates that any decision and the decision-making process were improper (see, e.g., Amirsaleh, 2008 WL 4182998 at *8-9 (company's "clandestine and unexplained decision to stop accepting late forms [for election to exercise options]" in an "arbitrary or unreasonable" manner thereby frustrating the "overarching purpose" of the agreement is sufficient to demonstrate a breach of the implied covenant of good faith).

62.     Indeed, the Company did not even attempt to formulate a reason, such as explaining to Muller that the decision was based on timing and would be revisited at a later date – this was a flat-out rejection without explanation, recourse, or any rationale.

63.     Further,  it is arguably to the *benefit* of the Company to allow holders to exercise options because the Company would receive the proceeds thereof (and there are certain option holders who have strike prices substantially higher than Muller's), and to establish goodwill by allowing the persons who contributed to the Company's success to share in the benefits thereof.

64.     The whole point of granting Muller the Options was to allow him to participate in the Company's success should it occur, and there is no reasonable justification for depriving Muller of this opportunity to participate.  Given the massive wealth obtained by Pender and Sabel, there is no good faith basis for their attempts to frustrate Muller's exercise.  Upon information and belief, Pender's and Sabel's strategy is to cause the Options to expire and become worthless by frustrating their exercise though expiration date in order to benefit themselves personally.

65.     In the alternative, upon information and belief, Pender and Sabel are trying to

14

benefit themselves by consolidating their ownership of the Company and doing so by causing the Company to enter into agreements for substantial buybacks of stock, and by wrongfully preventing exercises of options until the expiration thereof, all as a way to avoid dilution of the shares they each own at zero cost and increase their ownership of the Company, which, upon information and belief, has recently increased from approximately 50% to approximately 80%.

66.     Indeed, Pender and Sabel are well aware that nearly $1 billion in stock options are outstanding and there is a significant risk of dilution to them personally in the event the options are exercised.  Pender and Sabel are apparently acting in their personal self-interest to prevent exercise, thereby acting in bad faith.

67.     The Company has breached and/or repudiated its obligations under the 2017 Option Agreement and/or the implied covenant of good faith by acting improperly and in bad faith to frustrate Muller's attempt to receive the fruits of his Option,  namely the shares, which are the very reason he became associated with the Company in the first place.

68.     Muller has fully performed his obligations under the 2017 Option Agreement.

69.     Muller would not have become associated with the Company nor allowed the Company to trade off of his name, reputation, and professional credibility in the energy and project finance industry but for the options and the upside they presented.

70.     The Company's breach and/or repudiation of its obligations under the 2017 Option Agreement have caused Muller damages in an amount to be determined at trial but believed to be not less than $8,332,416.67.

WHEREFORE, Muller demands judgment as follows:

(i)     On the First Cause of Action, awarding Muller damages in an amount to be determined at trial but not less than $8,332,416.67,  plus interest, attorneys' fees and costs to the extent allowable by law;

(ii)     On the Second Cause of Action, in the alternative, awarding Muller damages in an amount to be determined at trial but not less than $8,332,416.67, plus interest, attorneys' fees and costs to the extent allowable by law; and

(iii)    For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: July 6, 2023                         SULLIVAN & WORCESTER LLP

By: */s/ Michael T. Dyson*
    Michael T. Dyson (VA Bar No. 40962)
    1666 K Street, NW
    Washington, D.C. 20006
    Telephone:  (202) 775-1217
    Facsimile:  (202) 775-6875
    mdyson@sullivanlaw.com

Gerry Silver, Esq.
(seeking admission pro hac vice)
SULLIVAN & WORCESTER LLP
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone:  (212) 660-3096
Facsimile:  (212) 660-3001
gsilver@sullivanlaw.com